UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,        )
                                 )
                Plaintiff,       )   CR 19-mj-6564-N/A(MSA)
                                 )
            vs.                  )
                                 )   Tucson, Arizona
Francisco Dario Mora,            )   November 21, 2019
Pedro Adan Sevilla,              )   3:15 p.m.
                                 )
_____Defendants.    __)

TRANSCRIPT OF PROCEEDINGS
DETENTION HEARING

BEFORE THE HONORABLE D. THOMAS FERRARO
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:
    Serra Tsethlikai
    U.S. Attorney's Office
    405 West Congress Street, Suite 4800
    Tucson, AZ 85701

For Defendant Mora:
    Greta Vietor
    Federal Public Defender's Office
    407 West Congress Street, Suite 501
    Tucson, AZ 85701-1310

For Defendant Sevilla:
    Thomas Higgins
    Law Offices of Thomas E. Higgins, Jr.
    325 W. Franklin Street
    Tucson, AZ 85701

Transcribed by:
    Cindy J. Shearman
    405 West Congress Street, Suite 1500
    Tucson, AZ 85701
    520-205-4286

                Proceedings were digitally recorded
            Transcript prepared by transcriptionist

UNITED STATES DISTRICT COURT

I N D E X

WITNESS                                                    PAGE

CREIGHTON BRANDT

Direct examination by Ms. Tsethlikai                         5
Cross-examination by Mr. Higgins                            31
Cross-examination by Ms. Vietor                             37
Redirect examination by Ms. Tsethlikai                      46


E X H I B I T S

| IDENTIFIED | OFFERED | ADMITTED |
| --- | --- | --- |
| Gov 1 | 17 | 37 |

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

(Call to order of court, 3:15 p.m.)

CLERK:  Calling case 19-mj-6564, United States of America versus Francisco Dario Mora and Pedro Adan Sevilla, on for detention hearing regarding dangerousness.

Counsel, please state your appearance.

MS. TSETHLIKAI:  Good afternoon, Your Honor.  Serra Tsethlikai for the United States.

THE COURT:  Good morning -- afternoon.

MS. VIETOR:  Good afternoon, Your Honor.  Greta Vietor on behalf of Francisco Dario Mora.  He's present in custody.

THE COURT:  Good afternoon.

MR. HIGGINS:  Nice seeing you again, Judge.  Tom Higgins appearing with Mr. Sevilla.  He's with me in custody.

THE COURT:  All right.  I'm only addressing the government.  The case against Mr. Mora, is that -- does that case trigger a presumption?

MS. TSETHLIKAI:  No.

THE COURT:  The case against Mr. Sevilla does, however, as a result of the allegation involving drugs; is that right?

MS. TSETHLIKAI:  Both.  He -- not only does he have the allegation of the drugs but I think I also charged a 924(c) -- no, I charged the 924(c) with the understanding that he had the 841 -- the 841.

UNITED STATES DISTRICT COURT

THE COURT:  That's right.  So both --

MS. TSETHLIKAI:  So both of those would cause the presumption to apply --

THE COURT:  Correct.

MS. TSETHLIKAI:  -- for mandatory detention and it's his burden to prove that he's not --

THE COURT:  Right.

MS. TSETHLIKAI:  -- a danger.

With respect to Mr. Mora, it was -- the gun -- the presence of the gun was -- or the possession and use of the firearm was enough to get us this detention hearing and now we're arguing dangerousness.

THE COURT:  All right.  So my question then is how would you like to proceed?  It is Mr. Sevilla's burden initially because of the presumption but it just seems like it might be easier to start with you calling your witnesses, presenting your case on Mora, which I would also consider for Mr. Sevilla.

MS. TSETHLIKAI:  Yes, Your Honor.  So, I only have one witness.

THE COURT:  Okay.

MS. TSETHLIKAI:  And he's the case agent related to this case.

THE COURT:  Okay.

MS. TSETHLIKAI:  So if I may call Creighton Brandt to

the stand, please.

THE COURT:  Sir, if you'd come up to the witness stand and before you sit down, raise your right hand so my court clerk can administer the oath.

CREIGHTON BRANDT, WITNESS, WAS SWORN.

THE COURT:  Thank you, sir.  You may be seated.  If you'd please state your name and spell your last name for the record.

THE WITNESS:  My name is Creighton Brandt.  My last name is spelled B-r-a-n-d-t.

THE COURT:  Thank you.  You may proceed.

MS. TSETHLIKAI:  Thank you.

DIRECT EXAMINATION

BY MS. TSETHLIKAI:

Q.  Agent Brandt, what is your occupation?

A.  I'm a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, commonly referred to as the ATF.

Q.  How long have you been with ATF?

A.  Almost 11 years.

Q.  And did you have any prior law enforcement experience prior to joining ATF?

A.  Yes, I did.

Q.  And what was that?

A.  I was with the Colorado Springs Police Department as a sworn officer for almost 12 years.

Q.   Are you currently a sworn officer?

A.   Sworn agent, yes.

Q.   Okay.  And are you the case agent in this case?

A.   Yes, I am.

Q.   And how did this investigation begin?

A.   This investigation began when we noticed that Francisco Mora and Pedro Sevilla had been purchasing several firearms.  A lot of the calibers that they were purchasing were those calibers that are typically highly sought after by Mexican cartels.  And we also noticed that there was a few recoveries of the firearms that they had purchased in the country of Mexico a short time period after they purchased them.

Q.   All right.  During this investigation, were you able to identify a time frame of a period of time of when these two individuals were purchasing firearms?

A.   Yeah, I mean, that time frame is still developing but primarily we really kind of honed in on from early June of this year to early September.

Q.   Of this year?

A.   Yes.

Q.   All right.  And you said that they were buying firearms that were commonly associated with cartels, Mexican cartels.  What type of firearms were they?

A.   Primarily they were like AK-47 style rifles or pistols, AR-15 style pistols, 9mm caliber handguns, things like that.

Q.   All right.   Now, you said that a few of the firearms had been recovered, correct?

A.   Correct.

Q.   How many -- how many of these firearms were recovered?

A.   Two of the firearms that Mr. Sevilla has purchased have been recovered and one that Mr. Mora had purchased has been recovered.   However, in one of the recoveries, on July 19th of this year, they each bought two AK-47 style pistols from a gun store here in Tucson, SnG Tactical, And each one of their firearms that they purchased were recovered 27 days later near Guadalajara, Mexico, in the same recovery incident.

Q.   So when you say "recovery incident", is that where law enforcement has been involved and they recovered firearms either on suspects or at the scene?

A.   Yes, or I believe in this case at a residence in Mexico.

Q.   All right.   And does Mexico then do Mexican eTraces to ATF to find out where these firearms came from?

A.   They do.   Mexican authorities have an MOU with ATF and they use our eTrace system so they can trace the firearms and determine who the purchasers are.

Q.   Now, you said that these firearms were recovered 27 days after they had been purchased?

A.   Yes.

Q.   All right.   So in Mexico, by law enforcement, correct?

A.   Yes, and it was in the state of Jalisco, Mexico, which is

further south into the country than, say, the state of Sonora.

Q.   All right.   You said that there was also a third firearm recovered.   Can you give us a description of that?

A.   Yeah, that was a handgun that Mr. Sevilla had purchased, and it was recovered in Wymus, Mexico.   And that was a 9mm caliber Taurus pistol.

Q.   Okay.   And how many days after it was purchased was it recovered?

A.   Approximately 40 days.

Q.   So would this be a short time to crime?

A.   Yes.

Q.   All right.   Now, with respect to that, once you heard -- once you started seeing that these firearms were being recovered, did you do any research on the individuals who purchased these firearms?

A.   Yes, we did.

Q.   All right.   And you said you identified Sevilla and Mora as being the purchasers, correct?

A.   Correct.

Q.   The individual named Mora, what was his full name?

A.   Francisco Dario Mora, Jr.

Q.   All right.   And do you see that individual in court right now?

A.   I do.

Q.   Can you please point him out and describe an article of

clothing?

A.   Yeah, he's the gentleman down to my left sitting next to --
I'm sorry.  I forget your name, ma'am.

MS. VIETOR:  Greta Vietor.

THE WITNESS:  And he's wearing like an orange top.  He
has, I guess, a more full beard.

MS. TSETHLIKAI:  Okay.  Your Honor, may the record
reflect that this witness has identified Mr. Mora?

THE COURT:  Any objections?

MS. VIETOR:  No, Your Honor.

THE COURT:  Okay.  The record will so show.

BY MS. TSETHLIKAI:

Q.   And you said that the other purchases were by an individual
named Sevilla.  Could you give me his full name, please?

A.   Yeah, it's Pedro Adan Sevilla.

Q.   Okay.  And do you see him in court right now?

A.   Yes, I do.

Q.   And can you please point him out and describe an article of
clothing that he's wearing?

A.   He also has a beard, similar orange shirt, he's sitting to
my right of Mr. Mora.

MS. TSETHLIKAI:  Okay.  And, Your Honor, would the
record reflect that this witness has identified Mr. Sevilla?

MR. HIGGINS:  No objection, Judge.

THE COURT:  It will.

BY MS. TSETHLIKAI:

Q.  With respect to the investigation related to Mr. Mora and Mr. Sevilla, did you do a wages check?

A.  Yes, we did.

Q.  And what's a wages check?

A.  It's basically we have a contact at Department of Economic Security where we can see what the reported income is.

Q.  All right.  And are these firearms that they were purchasing pretty expensive?

A.  They are pretty expensive, yes.

Q.  Okay.  And based on what they were purchasing from what you knew at the time that you began the investigation and how much they were actually earning at that time, could they buy those -- the number of firearms and the calibers that they were buying at that time?

A.  No, they could not.

Q.  Okay.  Now, during this investigation, you have actually learned of a number of firearms being purchased by these two individuals, correct?

A.  Correct.

Q.  And how many from three days ago did we have total firearms being purchased by these two individuals during three months?

A.  Approximately 17 by Mr. Mora and a few more, maybe approximately 19, by Mr. Sevilla, but we continually, it seems like daily, learn of more firearms that they have purchased or

that individuals that they're associated with have purchased.

Q.   All right.   And how did you gather this -- was it 18 firearms for Mr. Mora according to the complaint we swore?

A.   Yeah, that seems correct.

Q.   Okay.   And where would you -- where did you get this information that each of these individuals, Mr. Mora purchased 18 firearms and Mr. Sevilla purchased 19 firearms from June of this year until September of this year?

A.   Whenever an individual buys firearms from a federal firearms licensee, if they buy two or more firearms within a five-day period, that gun store is required to submit a multiple sale report to the ATF.   So we can learn about firearms that way.

We can also learn of firearms that are recovered and then traced by the ATF.   We can learn of firearms that way, which we did in this particular case.   It's just a matter of spending a lot of time on the phone calling -- calling gun stores to see if -- see if they've purchased any firearms.

Q.   And so were these licensed firearms dealers?

A.   Yes.

Q.   And what type of paperwork do they keep?

A.   They're required to keep an ATF form 4473 which has to be completed whenever an individual purchases firearms.

Q.   And does it list the specific firearm, the make and model and the caliber and price?

A.   It doesn't include price but it includes the make, model, caliber, serial number, but with each of the gun stores we're also requesting and they provided sales receipts for the purchases.

Q.   All right.  So were you able to get 4473s documenting all 18 and 19 of those firearms for each of these individuals?

A.   Yes.

Q.   All right.  Did you also learn that they were buying ammunition during the same time period?

A.   Yes, we did.

Q.   All right.  And did you learn that Mr. Mora had purchased over 10,000 rounds of ammunition -- 10,000 rounds of ammunition?

A.   Yes.

Q.   And with respect to Mr. Sevilla, he bought 15,000 rounds of ammunition?

A.   Yes, that sounds correct.

Q.   And how did you learn that, because they don't have to fill out a 4473 for ammunition?

A.   You don't.  However, Mr. Sevilla purchased -- one of the firearms that he bought was from J&G Sales in Prescott, Arizona, and that was the Taurus 9mm pistol that was recovered in Wymus.  We learned than he bought it from J&G.  So then we contacted J&G to see if either one of them had purchased items from them and that's where we learned about all the ammunition.

DIRECT EXAMINATION - CREIGHTON BRANDT

Q.   So they had receipts that they could provide to you proving up that the 10,000 and 15,000 rounds of ammunition were purchased by each of the different individuals?

A.   Yes, correct.

Q.   All right.  And during that time of June 2019 through September 2019, was it also discovered that one of the individuals was buying magazines for these different firearms?

A.   Yes.  Mr. Mora was.

Q.   And how many different magazines did he purchase?

A.   He purchased approximately, that we know about, 760 either AK-47 type or AR-15 type magazines.

Q.   760?

A.   760, yes.

Q.   Magazines.

        THE COURT:   Is that for Mora?

        MS. TSETHLIKAI:   Mora, yes.

BY MS. TSETHLIKAI:

Q.   What were the sizes of those magazines?

A.   Each magazine is capable of holding 30 rounds of ammunition.

Q.   So those were large capacity magazines?

A.   Yes.

Q.   And so 760 AK-47 and AR-15 type magazines?

A.   Yes.

Q.   All right.  And this was during the June through September

2019 period?

A.  Yes.

Q.  All right.  Did you prepare a spreadsheet based on that?

A.  I did, yes.

Q.  Of all the different purchases?

A.  Yes.

Q.  And how were you able to confirm the 760 magazines being purchased by Mr. Mora?

A.  From sales receipts provided by both Diamondback Shooting Supply and J&G.

Q.  Okay.  So these two gun stores actually do require identification and some type of paper --

A.  Yes.

Q.  -- for them to keep track?

A.  Yes, they do.

Q.  All right.  And did you rely on that paperwork that was provided by these different stores in creating your spreadsheet?

A.  Yes, I did.

Q.  All right.  And did you create a spreadsheet involving each of the very days and who bought and where did they buy and the type and caliber and serial number of the firearms?

A.  Yes, and the dollar amount spent.

Q.  If it was given to you, correct?

A.  Correct.

Q.   All right.   In preparing this spreadsheet, did you also attempt to get crossings of these individuals either from the United States into Mexico or from Mexico into the United States?

A.   Yes.

Q.   And how did you get that crossing information?

A.   A variety of ways, from contacting HSI agents to we have a -- ATF has an analyst out in California that can provide some of that information on a limited basis, more limited basis than what HSI agents can get us.   And this spreadsheet that we're talking about is still being developed.   I just added additional information last night.

Q.   Right, but the one we're using is the one you gave me two days ago and that I gave to the defense attorneys, right?

A.   Yes, correct.

Q.   So I don't have the even more updated with more crossings and more firearms, correct?

A.   That's right.

Q.   All right.   Now, did you -- did you personally prepare this spreadsheet?

A.   Yes.

Q.   All right.   And did you have verifiable information for every entry that you entered into this spreadsheet?

A.   Yes.

Q.   And what were you trying to show in this spreadsheet?

A.   Just kind of a pattern of life for basically a three-month time period.

Q.   For these two individuals?

A.   Yes, but now it includes other individuals as well.

Q.   All right.  Now, with respect to the information related to these two individuals on that, it does cover -- well, there's one entry for June 15th of 2016 and a few from 2017.  But mainly we're focusing on the 2019, correct?

A.   Correct.  Early -- early June of 2019 to early September of 2019.

Q.   And in the Exhibit No. 1, do you have a copy of that in front of you?

A.   I do, yes.

Q.   Is this the one that you prepared for us?

A.   Yes.

Q.   And is it fair and accurate?

A.   Yes.

Q.   And does it show the date, the person purchasing, the place purchased, and the firearms purchased as well as inbound and outbound crossings all in chronological order?

A.   Yes, as well as the AK, AR magazines and --

Q.   And the ammunition?

A.   And the ammunition, correct.

Q.   Right.

        MS. TSETHLIKAI:  Your Honor, at this time, the

government would ask to admit Exhibit No. 1 to show the history so that we don't have to go through each and every single day.

THE COURT:  Any objection?

MS. VIETOR:  No, Your Honor.

MR. HIGGINS:  I'm going to wait until after cross-examination, Judge.  I don't know if there's enough foundation right now.

THE COURT:  All right.

BY MS. TSETHLIKAI:

Q.  All right.  So then -- and you've already testified as to the numbers that are in here, correct, the 18 and the 19 and the 10 and the 15 and the 650 or 760 magazines, correct?

A.  Yes.  And there were -- you know, there were some other magazines in there as well that we have not discussed.

Q.  Okay.  So they were purchasing a lot more than what we've already discussed but you all based -- every entry was verified in some form, correct, either by tax records or crossing records or ATF 4473 -- what is it?

A.  Yes, that's correct.

Q.  All right.  And receipts from the two firearms store?

A.  Yeah.

Q.  All right.  Based on the information that you got, did you seek search warrants in this case?

A.  Yes, I did.

Q.  And when were those search warrants -- did you get search

warrants authorized?

A.   Yes.

Q.   And when were those search warrants served?

A.   They were executed on November the 13th of this year.

Q.   All right.  And who -- where did you guys search specifically?

A.   So here in Tucson we contacted Mr. Mora at his place of employment.  The search warrant included the person of him and the vehicle that he had at where he was working at the time.  So we contacted him that morning around 6:00 a.m.  We executed the search warrant on him.  We recovered two cell phones from his person.  We also executed the search warrant on his Subaru BRZ, blue in color vehicle, which was at his place of employment.  And then, in addition to that, we executed two search warrants at residences near Tucson related to Mr. Mora, one at 2918 East 24th Street and then another one at 2130 South Seventh Avenue.

Q.   All right.  And did you also do a search warrant on Mr. Sevilla's residence?

A.   Yes, we did, up in the Phoenix area.

Q.   All right.  And at the time of the search warrant at Mr. Sevilla's residence, was he present?

A.   Yes, he was.

Q.   And did the agents search the house?

A.   Yes, they did.

Q.  All right.  And this is based off of information that you got from other agents, correct?

A.  That's correct.

Q.  All right.  You weren't in the -- you weren't at his house?

A.  That's correct, I was not.

Q.  All right.  Now, during the search of Mr. Sevilla's house, can you describe what was found at the residence?

A.  In his bedroom, they recovered just about 12 pounds of fentanyl pills.  Most of the fentanyl was in a safe that was in his bedroom in his closet.  There was also a Starbucks bag that was not in the safe that was in his closet that contained over a pound of fentanyl pills.

In addition to that, in his bedroom near a TV stand it's my understanding there was a loaded AR-15 pistol in close proximity to the drug safe.

Q.  All right.  And were there other firearms found in the house of Mr. Sevilla?

A.  There was.  There was also a sawed off .22 caliber Marlin rifle that was on like a bipod stand.

Q.  Okay.  In what room, do you know?

A.  I don't recall.  I believe it was the living room.

Q.  All right.  And with respect to -- were there other firearms found?

A.  Yes, there were.

Q.  And how many?

A.   Three -- three or four others.

Q.   Yes, and where were they found in the house?

A.   I -- other than the living room, the AR-15 in his bedroom, I'm not exactly sure.

Q.   Okay.  Now, with respect to other items that were found in the house that are associated with Mr. Sevilla, how did you know first that the room with the safe and the closet were Mr. Sevilla's?

A.   Well, based on what they found in the room and I believe he admitted that that was his bedroom.

Q.   All right.  And with respect to the -- was there anything else found in the house that relates to Mr. Sevilla?

A.   Yeah, there was almost $13,000 in US currency found in the safe.

Q.   In the safe, all right.  Now, do you know whether or not the mother of -- Mr. Sevilla's mother was present during the search warrant?

A.   I believe she was, but I don't know for sure.

Q.   Do you know whether or not she lives at that house?

A.   Yes, she does.

Q.   All right.  And where the other four firearms were found, other than the one found in his room with the drugs, would Mrs. -- Mr. Sevilla's mother have easy access to them?

A.   Definitely the one that was in the living room.

Q.   Okay.  Now, I'm going to back up just a little bit.  You

had listed all the different crossings of Mr. Mora and

Mr. Sevilla from what you have found so far.

A.   Correct.

Q.   From June of 2019 to September of 2019, how many crossings

did Mr. Mora have?

A.   Approximately 56, according to the records that I've looked

at.

Q.   Okay.  And are those all inbound or outbound or --

A.   I believe all inbound.

Q.   Okay.

A.   Yeah.

Q.   Now, with respect to Mr. Sevilla, how many crossings did he

have during that same period of time?

A.   I don't recall exactly.

Q.   Would nine refresh your memory?

A.   Yeah, that sounds about right.

Q.   Now, with respect to the prices of all the different

firearms that you were able to document, about how much money

was spent by these two individuals during the month of --

months of June of 2019 through September of 2019?

A.   At the point that this document was prepared?

Q.   Yes.

A.   It was roughly $46,000.

Q.   $46,000 in three months?

A.   Yes.

Q.   All right.   And multiple crossings into Mexico, correct?

A.   Yes.

Q.   All right.   Now, with respect to the arrest of Mr. Sevilla, was he Mirandized?

A.   Yes, he was.

Q.   Did he give a statement?

A.   Yes, he did.

Q.   And what did he say?

A.   He said that he was buying guns for Mr. Mora and that Mr. Mora was paying him $100 per gun, and he was also buying ammunition for Mr. Mora, Mr. Mora was paying him $100 per purchase.

Q.   All right.   So it was Mr. Mora who was paying Mr. Sevilla to purchase the firearms and ammunition?

A.   Correct.

Q.   All right.   And did he advise about whether or not there were other individuals involved in this scheme to buy firearms and deliver them to Mexico?

A.   Yes.

Q.   And who did he advise of?

A.   Well, there was actually another individual when agents executed the search warrant in Phoenix.

Q.   Uh-huh.

A.   There was an individual named Danny --

Q.   Is it Mr. Najara (phonetic)?

A.   Yes, Najara.  That agents -- that eventually we were going to speak with but it turns out he was at the house that morning and he also spoke with agents and said that he was buying guns on behalf of Mr. Mora, and that he, too, was paid by Mr. Mora.

Q.   All right.

A.   We have since located other individuals as well.

Q.   Okay.  And those other individuals, were they being recruited and directed by Mr. Mora?

A.   One individual that we spoke with yesterday was actually recruited by Mr. Sevilla.

Q.   Okay.  Did he state, though, who was directing him to buy and who was paying him?

A.   He said Mr. Sevilla.

Q.   Okay.  It was Mr. Sevilla?

A.   Yeah.

Q.   All right.  Now, with respect to Mr. Sevilla's statement, what did he say about this fentanyl in this house?

A.   He said that an unknown individual had delivered the safe to his house and that he didn't know the combination to get into the safe and he didn't know what was in the safe.

Q.   All right.  But you also found more fentanyl.  Did it look the same?

A.   Yes, it did.

Q.   Okay.

A.   Very similar.

Q.  Okay.  So it had kind of consistent markings?

A.  Yes.

Q.  All right.  And has that been field tested as positive for fentanyl?

A.  Yes, it was.

Q.  All right.  Now, with respect to that, what did he say about the AR-15 found in his room?

A.  Well, that, you know, he had it for protection, and it was loaded.

Q.  Okay.  So it was loaded?

A.  Yes.

Q.  All right.  Now, with respect to the sawed-off firearm in his house, what did he say about that?

A.  That he was the one that had chopped it or cut it off.  It took him about 45 minutes.

Q.  So he's the one who created the sawed-off shotgun?

A.  Yes.

Q.  Or sawed-off firearm?

A.  Yes.

Q.  Okay.  Now, prior to the day of the search warrant, did you have contact personally with Mr. Mora?

A.  Yes.

Q.  And where was that?

A.  That was at his residence at 2918 East 24th.

Q.  All right.  And so it was at his residence, and could you

please describe how you had contact with Mr. Mora?

A.   Yeah, we went there to talk to him about the firearms that he had been purchasing.  I knocked on the door and when he answered the door, I didn't see it 'cause I was along the right door frame of the door, but the agent standing along the left door frame noticed that he had a pistol in his left hand.

Q.   Okay.  Did he describe what type of pistol it was that he had in his hand as he stood at the door?

A.   A handgun.

Q.   A handgun, all right.  And were you clearly marked as law enforcement?

A.   Yes, we were.

Q.   All right.  And --

A.   I had a badge around my neck and then the agent I was with had a bulletproof vest that said:  ATF, police.

Q.   Okay.  And so he came to the door with a handgun?

A.   Yes.

Q.   All right.  How long was your contact with Mr. Mora?

A.   That day, maybe 10 minutes.

Q.   Okay.  Now, on the day of the arrest of Mr. Mora, were you present?

A.   Yes.

Q.   All right.  And on the day of the arrest of Mr. Mora, did he state anything when he was being informed that he was going to be arrested?

A.   I mean, at the moment and continuously afterward just on how his life is over and how much trouble he's in.

Q.   Did he say anything about how many -- how much time he was going to do?

A.   He was concerned that he was going to do a lot of time.

Q.   All right.  Did you seize Mr. Mora's cell phones pursuant to the federal search warrant?

A.   Yes, we did.

Q.   And have you reviewed or gone through his cell phone?

A.   We've started to.  We haven't gone through it entirely.

Q.   Have you found any videos on the phone with Mora and firearms?

A.   Yes, we have.

Q.   And can you please describe the videos of Mr. Mora with the firearms?

A.   In one particular video, he's in his Subaru BRZ, there's an AK-47 type pistol that's on the left like down by his left knee, handgun on his lap, another video, same configurement with a shotgun in the back seat, another AK-47 pistol like in the passenger's seat area.

Q.   Okay.  Now, was Mr. Mora's mom present at the house when the search warrant was served?

A.   Yes, she was.

Q.   And was she interviewed?

A.   Yes, she was.

Q.   And what did she discuss about Mr. Mora and what he's been up to?

A.   She was very surprised to hear the dollar amount.  She also said that during the summer he went missing for about a two-month period where he would only come home one, two, maybe three nights a week, and that she asked him, you know:  Where have you been?  And he told her that it was none of her business; that he's an adult.

Q.   Now, I'm sorry.  I'm going to have to back up.  There was one other thing I needed to get out of Mr. Sevilla's statement.  Did he state where these firearms were going?

A.   He said that he was with Mr. Mora at least on five occasions when they drove them to Mexico.

Q.   Okay.  And did he state what Mr. Mora said was happening with these firearms?

A.   I'm sorry.  Say that again.

Q.   Did Mr. Sevilla state what Mr. Mora said about what was going on with these firearms?  No?

A.   Not that I recall.

Q.   Okay.  But he did -- but Mr. Sevilla admitted going down into Mexico to deliver firearms with Mr. Mora?

A.   Yes, he said that he would get dropped off, Mr. Mora would then take the firearms to a location, get money, and then Mr. Sevilla would get paid.

Q.   Okay.  And you said that you actually located Mr. Mora at

his place of employment, correct, on the day of the search warrant?

A.   Yes.

Q.   And where was that?

A.   That was at the Circle K at 12th and Ajo.

Q.   Okay.  And did you know how long he'd been at that job?

A.   I didn't, maybe a few weeks or so.

Q.   All right.

MS. TSETHLIKAI:  Your Honor, I have nothing further at this time.

THE COURT:  All right.  Cross-examination?

MS. TSETHLIKAI:  Oh, did I move to admit the exhibit?

THE COURT:  You did and I'm holding it for cross-examination --

MS. TSETHLIKAI:  Okay.

THE COURT:  -- of Mr. Higgins.

Well, who's going to go first?

MR. HIGGINS:  I am, Judge.

THE COURT:  Okay.  While you're walking forward, I just want to ask two questions of the agent.  You said -- you characterized the .22 rifle as sawed off.  That's sort of a -- I don't know what that means.  Was it shorter than permitted under the law?

THE WITNESS:  Yes, sir, that's correct.

THE COURT:  So that it would qualify as an

unregistered firearm?

THE WITNESS:  Correct.

THE COURT:  Wouldn't it qualify, then, for an enhancement under 924(c) if there was drugs involved?

THE WITNESS:  I guess, depending on if that firearm was --

THE COURT:  That's not related.  This was in Mr. Mora's house though, right?

THE WITNESS:  No, it was in Mr. Sevilla's.

THE COURT:  Okay.  And so in Mr. Sevilla's house, if it was under 18 inches, isn't -- 924(c) says a short barrel rifle.  So I'm asking, would that qualify as a short barrel rifle?

THE WITNESS:  Yes, it would.

THE COURT:  Okay.

THE WITNESS:  Yes.

THE COURT:  All right.  And then one other thing, when you say AK-47 pistol, I understand that to mean an AK-47 rifle where there isn't a stock.  Essentially, it's an assault rifle without a stock that's registered as a pistol.

THE WITNESS:  Correct.

THE COURT:  Allowing the barrel to be shorter?

THE WITNESS:  Yes.

THE COURT:  So a pistol can be under 18 inches?

THE WITNESS:  It would have to be 16 or more for a

rifle.

THE COURT:  For a rifle?

THE WITNESS:  Yeah.

THE COURT:  But when it becomes an AK-47 pistol, the barrel can be shorter than 18 inches, right, if it's a pistol?

THE WITNESS:  Well, I mean, it could be 16 and still be a legal, correct.

THE COURT:  As a pistol or as a rifle?

THE WITNESS:  As a pistol.  Well, because it doesn't have the stock so it's not -- it's not intended to be shot from the shoulder.

THE COURT:  Okay.  Now I've confused myself.  Let me back up.  I understand rifles have to be no shorter than a certain length.

THE WITNESS:  16.

THE COURT:  Right.  I thought -- and that's why I'm asking this question to make sure I'm not mistaken.  I thought the reason why they sell the pistols, the AK-47 pistols or the assault rifle pistols, is because, without a stock, it's a pistol, and the barrel can be shorter?

THE WITNESS:  Sure, yes.

THE COURT:  Lawfully?

THE WITNESS:  Yes.

THE COURT:  All right.  Thank you.

THE WITNESS:  Uh-huh.

THE COURT:  You may proceed.

CROSS-EXAMINATION

BY MR. HIGGINS:

Q.  On Exhibit 1 that you looked at, Agent Brandt, it's divided into -- it's a spreadsheet but it has border crossings on it and it has purchases on it, correct?

A.  Yes, sir.

Q.  And it's a timeline that you put together, correct?

A.  That we're trying to put together, yes.

Q.  All right.  So the border crossings are highlighted in red or green occasionally, correct?

A.  Yes.

Q.  And that's because of the difference between inbound or outbound, correct?

A.  Correct.

Q.  All right.  Now, I've counted them up.  There's 25 notations on your spreadsheet about the vehicles going in and out or pedestrian traffic in and out of Mexico, correct?

A.  For both, I'm not sure.  I would need to count them.

Q.  Okay.  Only one of those is Mr. Sevilla and you look at page 2, about midpage.

MS. TSETHLIKAI:  No.

THE WITNESS:  That's not true.  He's also on page -- he's on page 3 a few times, three times.

BY MR. HIGGINS:

Q.  Excuse me.  First two pages there's just the one, there's three on page 3, correct?

A.  Yes, and then --

THE COURT:  No, it looks like there's four.

THE WITNESS:  Four?

THE COURT:  At the top --

MR. HIGGINS:  I only get three.

THE COURT:  -- on July 19th.

MS. TSETHLIKAI:  There's four.

THE COURT:  And then down on August 1, it looks like four to me.

BY MR. HIGGINS:

Q.  And the next page there's -- all of them are Mr. Mora; is that correct?

A.  No, there's also two on page 4.

Q.  Well, I think --

A.  There's one on August --

MS. TSETHLIKAI:  Okay.  Sir, may I approach real quick?

THE COURT:  Yes.

MS. TSETHLIKAI:  Sevilla, page 4.

MR. HIGGINS:  Oh, and Sevilla, okay, all right.

BY MR. HIGGINS:

Q.  And then on page 5 there is just one mention of

Mr. Sevilla; is that correct?

A.   There's a -- there's a few more because you have --

Q.   I mentioned border crossing.

A.   Okay, you're talking about coming inbound?

Q.   Yeah.

THE COURT:   There's also coming -- going outbound. He's mentioned in the green if you look.

THE WITNESS:   Correct.

THE COURT:   On August 24.

BY MR. HIGGINS:

Q.   All right.  So there's two on the page 5?  The huge bulk of them is Mr. Mora, correct?

A.   Yeah, yeah, he has more crossings.

Q.   And the information you got also indicates a lesser role of Mr. Sevilla about selling and getting a kickback from Mr. Mora. In fact, that kind of fits in, he could have been riding with him, correct?

MS. TSETHLIKAI:   Objection, vague.

BY MR. HIGGINS:

Q.   That also dovetails with information you got from Mr. Sevilla about his role in this, correct?

A.   Yeah, I mean, according to Mr. Sevilla, he was buying the guns on behalf of Mr. Mora.

Q.   Now, do you have any evidence that Mr. Sevilla, if he's released, will continue buying guns or dealing drugs or

anything?

A.   I can't really predict the future.

Q.   No.  Do you have any evidence -- and I'll go through the types you might have.  Do you have any evidence that he threatened anybody, law enforcement, anything like that?

A.   You know, some of his, I guess, Facebook messenger messages that we're going through on his cell phone, some of them are in the Spanish language which I don't speak Spanish, so we're still in the process of reviewing a lot of evidence, I guess.

Q.   Do you know of any threats from Mr. Sevilla?  Don't give me this I'm going to look in the Spanish language.

A.   Yeah.

Q.   Do you know of any threats?

A.   Oh, against law enforcement?

Q.   Yeah.

A.   No.

Q.   All right.  Do you know of any threats against prosecutors?

A.   No.

Q.   How about threats about co-defendants, any threats against Mr. Mora?

A.   No.

Q.   No?  How about any other potential witnesses, any threats about them?

A.   No.

Q.   Okay.  How about any information that he is likely to

leave, flight things?  Do you have any information that, from law enforcement, that he's said he was going to leave?

A.   There's a -- there's a message or conversation back and forth between Mr. Sevilla and Mr. Mora where they talk about how they are still going to go to Mexico.  Mr. Mora said he's going to go down there to visit his tias, and I think maybe like a girlfriend down there but that they're not going to, you know, do what they were doing before.  So it sounds like, yeah, they'd have ties to Mexico.

Q.   So I asked you, do you have information that he intended to flee to Mexico or anywhere else?

A.   No.

Q.   Do you have any information that -- from other inmates, jailhouse people, saying they heard him say he was going to flee, take off?

A.   No, no.

Q.   How about jail phone calls, anything with the family, they're all monitored, anything about him taking off?

A.   We have not had a chance to review any jail phone calls.

Q.   Okay.  So everything you've testified today is evidence from the case-in-chief; that's what you worked up, correct?

A.   Yeah.

Q.   Okay.  So, I mean, you don't know of any future dangerousness at all, do you?

A.   I don't.

Q.   And any flight plans, not to answer if he's released today, you don't know anything about that, do you?

A.   I don't know.

Q.   All right.  You said in response to questions from the prosecutor that -- that you checked to see if they could afford the number of weapons they were buying?

A.   Well, I mean, we were -- we looked at what the reported wages were.

Q.   Right.  But if they take one gun and sell it and let's get two and sell those and get four, that's not going to be reflected on that at all, is it?

A.   No, it wouldn't.

Q.   Do you have any information that Mr. Sevilla has any prior convictions?

A.   No, I don't believe he does.

Q.   How about arrests?

A.   I don't believe he does.

Q.   Okay.  Do you have any information that he has any property out of the jurisdiction?

A.   Not that I know of.

Q.   Okay.  Do you have any reason to believe that he could not be trusted on release status?

A.   You want my opinion?

Q.   No.  I want facts, not your opinion.  That's exactly what I'm asking, facts.

A.   Yes.  He had a lot of drugs in his possession.

Q.   Okay.  And --

A.   And loaded firearms.

Q.   And when people are arrested for drugs and firearms before, there's no tie that they're probably going to do it in the future, are there?  You don't have any reason to believe he can't comply with the order of the court, do you?

A.   I'm just telling you the facts of what was found.

Q.   That's exactly what I want is the facts.

A.   Yeah, yep.

Q.   You have no reason to believe he's not going to comply, correct?

A.   Yeah, I don't know.

Q.   Okay.

MR. HIGGINS:  That's all I have.  Thank you, Your Honor.

THE COURT:  All right.  What about the Exhibit 1?

MR. HIGGINS:  Oh, I have no objection how they use it.

THE COURT:  Okay.  So Exhibit 1 will be admitted.

Ms. Vietor?

CROSS-EXAMINATION

BY MS. VIETOR:

Q.   Good afternoon, Agent Mora --

A.   Good afternoon.

Q.   -- or, sorry, Agent Brandt.

A.   Yes.

Q.   I'd like to ask some questions based on your testimony. You indicated that on this timeline various purchases were made by Mr. Mora of either firearms or ammunition?

A.   Yes, or magazines.

Q.   Or magazines.  And these were legally purchased --

A.   Yes.

Q.   -- items?

A.   Yes.

Q.   He filled out ATF forms that are required when purchasing these items?

A.   The firearms, yes.

Q.   And you indicated that these types of firearms are known to be used by the cartels in Mexico, AK-47s, AR-15s, that type of firearm?

A.   Yes.

Q.   They're also purchased by US citizens here in the United States who use them in this country?

A.   I've never seen someone purchase in that kind of quantity.

Q.   I didn't ask about the quantity, I'm just asking --

A.   Sure.

Q.   -- these types of firearms are purchased by people here in the United States and they are used, whether for target practice or whatever they're using them for, here in the United States?

A.   Yes.

Q.   They're not just used by the cartels in Mexico?

A.   Correct.

Q.   You mentioned that one of the items or firearms that had been purchased by Mr. Mora was located in Guadalajara in Jalisco; is that right?

A.   Yeah, it was Zapopan, which I think is a suburb of Guadalajara.

Q.   And you don't have any evidence that Mr. Mora was in Guadalajara?

A.   We do not.

Q.   No plane tickets that he purchased going to Jalisco?

A.   No, just the crossings that are in Exhibit 1.

Q.   Okay.  And in looking at those crossings in Exhibit 1, you don't have any evidence that -- do they -- did agents look at the cars every time that Mr. Mora crossed back into the US or crossed into Mexico?

A.   Can you --

Q.   I'm sorry.  Let me rephrase that.

A.   Yeah.

Q.   In every outbound and inbound crossing, were -- that you have listed in this exhibit, did agents, did they search the vehicle?

A.   Not that I know of, no.

Q.   So there's no evidence of either firearms or money being

found on all of these outbound and inbound listings that are in Exhibit 1?

A.   Correct.

Q.   And you would agree that here in Tucson many people frequently cross back and forth from the US side to the Mexican side?

A.   Yes.

Q.   Now, the search warrant that was done at the residence at 2918 East 24th Street, is that Mr. Mora's mother's house?

A.   It is, yes.

Q.   Okay.

A.   Well, I think it's owned by his sister, Jocelyn.

Q.   His sister?

A.   Uh-huh.  And she's on the utilities there as well.

Q.   Were any firearms located at that residence?

A.   Yes.

Q.   Okay.  And I don't believe you testified about that earlier but can you tell me what was found?

A.   There was a 12-gauge shotgun.

Q.   And anything else?

A.   Some ammunition.

Q.   Okay.  And when you made contact with Mr. Mora before arresting him, I don't know if it was a day before, a few days before at his house, you indicated that he answered the door and there was -- he had a pistol on his side or near him?

A.    It was my understanding that it was in his left hand.

Q.    Okay.  Were you present?

A.    I was present, yes.

Q.    Okay.  Did you see the pistol?

A.    I did not, no.

Q.    Okay.  Is it lawful for somebody to have a pistol that they have legally purchased on them in their own house?

A.    Sure, yes.

Q.    During the execution of the search warrant at that house and the other property at Seventh Avenue, no narcotics were found, correct?

A.    Not that I recall, no.

Q.    The fentanyl was found only in Mr. Sevilla's residence?

A.    Correct.

Q.    The arrest -- Mr. Mora's arrest took place at the Circle K at his job?

A.    No.  He was detained at the Circle K so we could execute the search warrant on his person and on the car and then about an hour after he was detained, he was released and then he drove himself to the 24th Street address and then after we developed additional information in this investigation, we made the decision to arrest him and take him into custody.

Q.    So he was arrested at the 2918 East 24th location?

A.    Yes, that's correct.

Q.    Okay.

A.   Yep.

Q.   And from there where was he taken?

A.   He was taken to the ATF office and then to the Pima County Jail for the night and then to this building the next day.

Q.   Was he Mirandized?

A.   I don't think so, no.

Q.   You're not aware that Mr. Mora has any outstanding warrants, are you?

A.   I'm not aware.

Q.   He has no prior felony convictions?

A.   No.

Q.   No prior incidents of violent crimes?

A.   He had a domestic incident several years ago that I think was dismissed by the court.

Q.   But other than that incident, no other violent crime incidents?

A.   Correct.

Q.   No failures to appear in court?

A.   Correct.

Q.   He's not a prohibited possessor?

A.   He is not.

Q.   Do you have any evidence that he's made any threats to law enforcement or others?

A.   There -- there was an agent at the scene on 24th and, actually, I was present, too, about, you know, him challenging

me to go to his jiu jitsu gym, and it definitely came across as being revengeful in nature.  This was after he told me that I'm going to go to hell.

Q.  This is before he was arrested?

A.  I believe so.

Q.  When you first made contact at his house to question him?

A.  We -- well, we first made contact that morning at the search warrant at the Circle K.

Q.  As far as you know, he has no mental health issues?

A.  No.

Q.  He's a United States citizen?

A.  Yes.

Q.  He's lived here in Tucson for many years?

A.  Yeah, I don't -- I don't remember the year that he naturalized.

Q.  As far as you know -- I'm sorry?

A.  I was just saying I don't recall the year.  I think there was a document found during the search warrant that speaks of his naturalization into the US but I don't recall which year that is.

Q.  You have no evidence of him owning any property in Mexico?

A.  No.  He did tell me that he had a son in Mexico.  Whether or not that's true, I don't know.

Q.  You are -- are you aware he has a child here in the United States?

A.   I'm aware of that, too, yeah, a daughter.

Q.   Has the video that you testified to been disclosed to the government, the cell phone video?

A.   No, not yet.

        MS. VIETOR:   Your Honor, I would just move to strike any testimony regarding that video.  That hasn't been provided to the government or defense counsel.

     And I have no more questions.

        THE COURT:   All right.  What's the government say about that?

        MS. TSETHLIKAI:   Your Honor, with respect to that, I was only asked for any written statements that they -- that he has made so I gave them a copy -- I gave them a copy of the probable cause statement and I also gave them the copy of the Exhibit No. 1 before we -- so I gave what they had requested.

        THE COURT:   I understand that but what she's specifically addressing is he testified on direct examination of looking at the cell phone video and described firearms that were in the possession of her client on that video.  And she's indicated that she has not seen that video.

        MS. TSETHLIKAI:   This is true.

        THE COURT:   And so now she's objecting to the court considering that and asking that that be stricken --

        MS. TSETHLIKAI:   Well, Your Honor, this is -- I'm sorry?

THE COURT:  -- for this hearing.  That's it.

MS. TSETHLIKAI:  Well, my -- my response to that is this just goes to what is his basis for why this individual is dangerous.  This is evidence that was collected pursuant to a valid search warrant.  They're still inventorying the evidence.  They haven't even gone through everything on either -- on both the cell phones, they've just glanced through it to make sure that we're going to need to dump them.  We are going to dump them.  So it is based off of reliable information that he received from the defendant and it is going to his reasons for why he thinks this defendant is a danger to the community.  If they want, we can make copies available.

THE COURT:  Right.

MS. TSETHLIKAI:  And provide that to them as soon as possible.

THE COURT:  So, at this stage, it's not Jencks material, it's a video.  It's -- it would probably be required to be disclosed if the government's going to offer it in their case-in-chief in trial.  At this -- at this stage, there's lots of things that the witness could testify to that has not yet been turned over.  I don't think Rule 16 requires it to be turned over before the -- before the detention hearing, just Jencks material, I believe.  Based on the government's representation, the Jencks material has been turned over.  I'm going to overrule the objection.  Although I will say it really

-- in the context of things, it's not very meaningful to me. If that's of any satisfaction.

MS. VIETOR:  Okay.  I have no more questions.

THE COURT:  Okay.  Thank you.  Any redirect?

MS. TSETHLIKAI:  Yes, just very briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. TSETHLIKAI:

Q.   Agent Brandt, how long have you been an ATF agent?

A.   Ten and a half years.

Q.   All right.  And during your ten and a half years, have you done investigations related to trafficking of firearms?

A.   Yes.

Q.   All right.  Based on your training and experience, what does the number of AK-47 and AR-15 firearms tell you?

A.   Yeah, that they're -- the number that these two were buying, that it's not typical that we have seen individuals buy those -- that number for themselves.

Q.   Based on your training and experience, what does the number of magazines that Mr. Mora purchased tell you?

A.   That it's being trafficked.

Q.   All right.  760 magazines, 30-round magazines.  Based on your training and experience, what does the time of the crossings into Mexico with the time and date of the purchases of the firearms tell you?

A.   They're in correlation to the purchases.

Q.   Weren't they pretty much made pretty close in time to each of the times that they were purchasing?

A.   Yes.

Q.   And the fact that in many of the instances Mr. Mora and Mr. Sevilla are together buying these firearms on the same dates, correct?

A.   Yeah, or the outbound is, you know, it's within a day or two.

Q.   All right.  With respect to the two of them, though, does the evidence show that the two are working together?

A.   Yes.

Q.   All right.  The 12-gauge shotgun, that's not related to the AR-15s or the AK-47s, correct?

A.   No.

Q.   We're not even going to charge that from what I know, yet I didn't even know about it.

A.   Right.

Q.   How many times have you answered the door with a firearm out and in your hand?

A.   I never have.

Q.   All right.  And you're armed, correct?

A.   Yes.

Q.   You have firearms, correct?

A.   Yes.

Q.   All right.  And during the time that Mr. Mora was making

his statements on the day of the search warrant and eventually at the time of his arrest, was he being asked any questions as he's making these statements?

A.  No.

Q.  No?  So what he was telling you and what you testified to were spontaneous?

A.  Yes.

Q.  All right.  So when he said the things that he said, you had not asked him any questions?

A.  No.

Q.  And you said that he had told you he has a son in Mexico?

A.  Yes.

Q.  All right.  And did he state whether or not the son -- he has contact with the son in Mexico?

A.  He didn't.

Q.  Okay.

        MS. TSETHLIKAI:  Your Honor, I have nothing further.

        THE COURT:  Okay.  Any redirect or, I'm sorry, recross?

        MR. HIGGINS:  No, Judge.

        MS. VIETOR:  I'm sorry.  I was conferring with my client.

        THE COURT:  Do you have any more recross?

        MS. VIETOR:  No, Your Honor.

        THE COURT:  All right.  May the witness step down

then?

MR. HIGGINS:  Yes, Judge.

MS. TSETHLIKAI:  Yes, Your Honor.

THE COURT:  Okay.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Does the government have any other witnesses or any other evidence they want to present?

MS. TSETHLIKAI:  No, Your Honor.  I would just like to make arguments --

THE COURT:  Sure, go ahead.

MS. TSETHLIKAI:  -- based off of the --

Your Honor, with respect to Mr. Sevilla, at this time, we would ask that the court invoke the presumption based on the quantity and the amount of fentanyl in the defendant's own bedroom and the fact that he's claiming that it was all locked up and he never touched it but that is belied by the fact that --

THE COURT:  Wasn't the charge with an offense that carries --

MS. TSETHLIKAI:  Carries a minimum.

THE COURT:  -- that the maximum sentence falls within the statutory requirement?  I can't invoke or not invoke.  I'm required -- there is a presumption.  That really has nothing to do with me.

MS. TSETHLIKAI:  All right.

THE COURT:  So there's a presumption that he's a flight risk and danger.

MS. TSETHLIKAI:  Right.  We'd ask that you find that we have proven that that presumption --

THE COURT:  Oh, I find -- oh, okay.  You're asking me to find probable cause to believe.

MS. TSETHLIKAI:  Yes.

THE COURT:  Okay, fine.  Now I get it.  All right.

MS. TSETHLIKAI:  I'm sorry.  I'm not being very articulate today.

THE COURT:  No, that's fine.  I guess I'm a little slow.

MS. TSETHLIKAI:  And then also with respect to the fact that he is charged with a 924(c) related to possession with intent to distribute, a firearm, one which was loaded and in that same room, we'd also find that there is probable cause to find that that presumption has been met and that the defendant has not yet overcome that burden.

With respect to Mr. Sevilla as well, he has a father who lives in Mexico, so he does have family who lives in Mexico. His job that he had was only a recent job of two months.  He's had suicidal ideation for -- from just recently of about eight months ago.  According to the time of his arrest, he had previously used marijuana and cocaine just -- just two days prior.  He has a bunch of fentanyl in his house and in his

bedroom in an open sack in his closet.  He also admitted to smoking marijuana daily.

I understand that the mom is willing to be a third-party custodian but she has all of these drugs, all of these firearms in the house, with the sawed-off shotgun in the living room where she has access to that as well, and is not -- does not appear to be concerned about that firearm in the house and easily accessible.

THE COURT:  I'm not sure I heard testimony that it was a sawed-off shotgun.

MS. TSETHLIKAI:  There was a sawed-off firearm, I'm sorry.

THE COURT:  The .22 caliber rifle?

MS. TSETHLIKAI:  Right.

THE COURT:  Okay.

MS. TSETHLIKAI:  But it's a sawed-off firearm.

THE COURT:  Right.  But you mentioned the shotgun, that would have --

MS. TSETHLIKAI:  Yeah, I -- for me doing firearm offenses, I do not think about firearms.  It's really very pathetic, actually, that I don't know anything about firearms and I have to call the agents each time I'm going to say something.  So, obviously, I did not call Mr. Brandt about that.

With respect to Mr. Mora, I understand that we had to

present evidence but definitely with respect to Mr. Mora, and the fact of the matter is this defendant indicates that his weekly travel to Mexico, he has a girlfriend in Mexico.  The defense has elicited he also has a son in Mexico.  It is apparent the mom has no control of the son and I'm not sure that she would actually be able to control him or to make sure that he stays where he's supposed to and follow when he's telling her to mind her own business even though he's living in her house.

His Circle K job is only two weeks old.  He has daily marijuana use.  He also has recent cocaine use.  He's current -- I mean, while he is a naturalized citizen, I think all of his ties to Mexico, the fact that he has so much cash that was readily accessible to him in Mexico, the amount of cash of over $46,000 of firearm purchases, and that's not including what they were getting paid by the individuals that they were trafficking these firearms to, so that's actually higher, in just three short months, which was just two months ago with the last incident.  And that the government does acknowledge it's been two months but it's still so recent.  His ability to get in and out of Mexico so easily, while that's true for everybody, the fact of the matter is is that he does have sufficient ties in Mexico to make him a flight risk.

His challenging of the officer while the search warrants were going on and telling him that he's just looking at so much

time really goes to show that he is concerned.  And while he doesn't want to do that, I'm sure most people wouldn't, but based on that and the amount of trafficking.

Furthermore, he was the leader and the organizer with respect to recruiting Sevilla and Mr. Najara.  He's the one paying Mr. Sevilla.  So with respect to that, he's got a very involved role.

He is a danger to the community of providing these types of firearms and I just -- 760 30-round magazines for AK-47s and AR-15s.  He's arming an Army.  I mean, a small Army.  I just can't imagine 760 magazines at 30-round capacities for these types of firearms.

The fact that, you know, he keeps firearms readily available to himself as he's driving, at his house, as he's opening the door.  Everything here just shows he is a flight risk and he is a danger to the community.  I think we've met our burden and I would ask that he be detained as well as Mr. Sevilla based on the presumptions.

THE COURT:  Right.  Thank you.

Who wants to argue first?  Mr. Higgins?

MR. HIGGINS:  Judge, it always kind of interests me that the government tries to prove dangerousness by having a mini trial on proving the facts of the case.

THE COURT:  I don't -- I'm going to let you argue but she's in a situation where she has to establish probable cause

to believe --

MR. HIGGINS:  Right.

THE COURT:  -- they committed the offense and so --

MR. HIGGINS:  And she has to put that on.  However, when you rule on dangerousness and you make a detention hearing, you have to go and assess and in a certain sense use your gut instinct to see if this is the proper thing to do.  And I realize that they have to make an establishment of it but dangerousness is -- there's a lot of different ways to do it.

And I've been in this courtroom and I've been where they've got jail calls, you can tell in a second they would have probably been in here with a CD if there was anything like this.  There's nothing like this.  Judge, he's a 22-year-old kid.  And the government put on the case they could, but there's one person or one institution that is not in the advocacy role here and that's pretrial services.  And they did not say one thing that pretrial has not taken into account.

THE COURT:  Oh, yes, they have.  Because pretrial does not consider dangerousness, they don't evaluate cases for dangerousness.

MR. HIGGINS:  Right.

THE COURT:  They only evaluate whether or not there is a risk of flight and whether or not there are conditions that they can recommend that would ameliorate the risk of flight, and they also only know about the information contained

basically in the complaint --

MR. HIGGINS:  Right.

THE COURT:  -- and the information provided to them by the defendant during the interview.  So that's why we have the detention hearings because --

THE WITNESS:  They also said in their report on page 2, poses a risk of danger based on the nature of the alleged offense.  So at least they know -- and they're actually considering the same thing the government's considering. They're looking at and saying that.

THE COURT:  I don't know why they put this in there because they really don't.  I've had running debates with them about that.  They don't consider it.  It's kind of frustrating.

MR. HIGGINS:  Well, I don't think it's any different than a run of the mill gun case anyway.  There is no legislative or statutory cut-off with over 15 guns this and all.

THE COURT:  Right.

MR. HIGGINS:  Mr. Sevilla, the search of his house turned up substantial amounts of fentanyl and that is a huge concern.  But I think -- and we just don't realize it enough, but that 1984 Bail Reform Act has a presumption of release. You're to find the least restrictive form --

THE COURT:  Correct.

MR. HIGGINS:  -- to do that.

UNITED STATES DISTRICT COURT

THE COURT:  But there's also a presumption of detention for flight and dangerousness --

MR. HIGGINS:  Right, when there's a mandatory time.

THE COURT:  -- as a result of the quantity of drug involved.

MR. HIGGINS:  Right.  But the fact is is that he doesn't have as much, as far as I am concerned, as a parking ticket.  That's got -- that's got to be worth something.

THE COURT:  So here's my concern.

MR. HIGGINS:  My conversation --

THE COURT:  I'll tell you what my concern is about your client, okay?  I take completely to heart what you're saying.  He's a young man but here's the reality.  Man, this guy's going to go to prison for a long time if he's convicted for this.  You've got -- you've got that quantity of drugs, and even if he qualifies for Safety Valve, he will -- his guideline range will be high.

MR. HIGGINS:  Right.

THE COURT:  He has a 924(c).

MR. HIGGINS:  Correct.

THE COURT:  That's consecutive to anything he faces on the gun -- on the drugs.  There was a sawed-off .22.  As I read the statute, that's a consecutive 10-year term of imprisonment.  So whatever he gets, he's going to have 10 years on a gun count and he's going to have, what, five, 10, 15 years on the drugs?

I don't have any idea what that much fentanyl is going to go up to in terms of the guideline range.  I know the maximum sentence is life without the possibility of parole.

MR. HIGGINS:  No, I'm aware of the statutory --

THE COURT:  If he doesn't qualify for Safety Valve, he's going to go to prison for the rest of his life.

MR. HIGGINS:  I'm aware of that, Judge.  I'm talking about the ability of the defense attorney to deal with his client and prepare for trial.  You're also assuming the validity of the warrant.

THE COURT:  No, I'm concerned about it.  Because I -- and I take that at your word that, actually, the statute and the case law is the strength of the government's case is the least of the factors.

MR. HIGGINS:  The least important factor.

THE COURT:  And I acknowledge and I don't want to overstate what I just said.  I'm just -- what I'm saying what my concern is he has ties to Mexico -- I'm telling you this so you can take into consideration and maybe urge a way of arguing that may convince me differently.  I'm not trying to torture you.  But I'm concerned because I look at a young man 22 years old who has a great incentive to leave and not come back, especially since he has ties to Mexico.  'Cause the length of time that he's facing in prison if he's convicted of this is going to be very, very harsh.  That's -- that's why I bring it

up 'cause I think it creates an incentive to flee.

Plus you have all of the -- you have the dangerousness. That kind of drug -- the reason why there's a presumption is because Congress recognized that people engaged with this kind of quantity of drug have a tendency to continue to do the same kinds of things over and over again.  That's why the presumption is there.  And we see that confirmed in this case by the trafficking of the guns and the quantity of the fentanyl.

THE COURT:  Right.

MR. HIGGINS:  Well, we get put in a position and I'm put in a position of proving a negative, that he is not going to be a flight risk and he is not going to be dangerous to any other person.  That's why I went into, well, the questions, do you have any evidence of that --

THE COURT:  Right.

MR. HIGGINS:  -- except the presumption?  And, of course, there is no evidence of that except the presumption.

THE COURT:  Well, the presumption -- actually, even if a person overcomes the presumption, the reasons for the presumption is what the cases say still exists.  The reason why there's a presumption is that people who engage in these kinds of conduct tend to continue that kind of conduct.

And my concern about both of these defendants is that this was not an event that occurred on one day.  It wasn't like they went to the store, they bought something, and took it to Mexico

and they had one event.  This is over a period of three months.

MR. HIGGINS:  Correct.

THE COURT:  So it shows a pattern of conduct.  And I can only gauge future conduct by past conduct.  That's the only way you gauge future conduct, unless somebody tells you they're going to do something, that's their intent to do something, then that's different.  But, generally, for courts, you have to look at their past to see what they're going to do in their future.

MR. HIGGINS:  Right.  And in the past, there's no past, that's what I'm saying.

THE COURT:  There's three months of trafficking in guns and he has a large quantity of fentanyl.

MR. HIGGINS:  And the evidence you have right now is not that there was any tie or use of fentanyl about that.  That's a substantial amount of fentanyl and I'm not going to downplay that.  But the flip side of it is, what evidence do you have that he's going to?  You have none.

THE COURT:  That he's going to do what?

MR. HIGGINS:  That he's going to continue stockpiling fentanyl or trading guns.  You have none.

THE COURT:  I'm looking at his past.  You know, it's like -- it's like anything else.  Somebody who has done things repeatedly in the past, you would say:  Well, there's a chance they may repeat in that the future.  And that's what I'm

saying.  He has developed a pattern over the course of the government's only three months of investigation that he was engaged in trafficking in firearms and now we have a situation where he's also found in large quantities of fentanyl.  And, in my experience, you don't find yourself with quantities of large -- in your own simple possession in your home, it's different if you're driving a car across the port, I understand that.

MR. HIGGINS:  So what you're saying is, because he had a larger than amount or more specific acts of the guns, he's likely to do it again?

THE COURT:  I think that -- look, the standard is this:  I have to -- the government has to establish by a preponderance of the evidence that the defendant is a flight risk.  They have to establish by clear and convincing evidence that he is a danger.

MR. HIGGINS:  Right.

THE COURT:  And I'm saying that he was found in possession of -- this is -- there are lots of facts involved in this.  He is found in possession in his own home of large, very large, quantity of fentanyl.  As distinguished from a person who was paid to transport fentanyl across the border, they come through the port of entry, they're driving a car, it's in there.  That's a one-time deal.  Sometimes you find that they've been doing it over a period of time.  Okay.  Now I have a pattern for that person, too.

MR. HIGGINS:  Right.

THE COURT:  But in this situation, it was probably brought in, he's ultimately where it is, you know, and that's what I'm looking at.  So I've got a guy who was involved in continual trafficking in firearms over a period of time, and I have him also involved in drugs and firearms, and I'm looking at the penalty associated with it.  The penalty associated with it and his repeat behavior just seems to me that he's a huge risk of flight.

And the pattern of transporting the firearms suggests to me that he's a danger as well.  That -- I'm just telling you what I think and I know -- I'm not telling you I've ruled that way but that's where I'm leaning.

MR. HIGGINS:  No, you've probably seen hundreds, if not thousands of these cases --

THE COURT:  Right.

MR. HIGGINS:  -- where people didn't and did what they were supposed to do.

THE COURT:  Right.

MR. HIGGINS:  And I'm saying you'd think that their presumption of innocence would at least overcome that and especially he's 22 years old.  And I know the amounts of the drugs are large.  I'm not -- I'm not -- we don't have any information how they were there or what they were there for but they were there mainly in the safe and there was some out in

the -- I get that.  But without some sort of evidence that it's a likely or a risky occurrence to let him out, pretrial knows how to take care of these things; they do it on a daily basis.

THE COURT:  Well, I doubt that pretrial services knew the results of the search warrant when they did the report because they don't go into houses where there's firearms.  That's why they do their -- that's why they do their searches.

You know, I want to comment on the presumption of innocence.  He is presumed to be innocent and I'm not taking away from that.  That's a different situation -- that's a different setting.  As to whether or not he would be sentenced in this case.  The law is very clear what I'm required to do.  The government presents evidence at these hearings, then I have to make a finding of probable cause or not.  If they don't establish probable cause, they've failed to prove their case, then I wouldn't consider it.  But if they present evidence, I find that there's probable cause to believe the person committed this offense, I have to consider that.

Then the other thing that happens is, just because there's probable cause to believe, and even though the evidence is strong, that's the least important factor 'cause all I'm concerned about is risk of flight and the potential for dangerousness.

And so then I look at other factors.  And the factors I'm looking at here, the concern about the risk of flight is, he

has -- he has very strong ties to Mexico.  He has -- he is a young man.  And he is facing substantial amount of time in prison.  And he has -- and so he has a great motive, a great motive to flee and that's what I'm concerned about.

MR. HIGGINS:  It's just the thought that they're, like I said, proving a negative.  You look to the past, you don't see any proof of that.

THE COURT:  Well, he doesn't have a criminal record and that's in his -- he has many things in his favor.  He does not have a prior criminal record is huge.  That's a huge factor in his favor.

MR. HIGGINS:  Right.

THE COURT:  And I acknowledge that.

MR. HIGGINS:  Okay.  That's all I have, Judge.  Thank you.

THE COURT:  Okay.  Thank you.

Ms. Vietor?

MS. VIETOR:  Thank you, Your Honor.

Your Honor just mentioned that you gauge future conduct by past conduct but I would just suggest that if released, Mr. Mora will be on pretrial release.  He's not going to be allowed to have firearms in the house, he wouldn't be able to go and legally purchase a firearm.  ATF would know immediately if that were to happen.

I don't believe that the government has met its burden of

showing by clear and convincing standard that he is a danger. He has no history to suggest that he is violent or has been a danger to the community.  Like Mr. Higgins said, the government is basing its argument on the alleged facts in the case.

Even if the court finds that he is a danger, the court can still release somebody if there are conditions or a combination of conditions that will reasonably assure the safety of the community.  Those conditions, I would propose, banning any weapons or ammunition in the house, no permission to travel to Mexico, he would have to surrender his passport, any other travel documents, possible ankle monitoring, GPS monitoring, maybe a ban on sending or receiving money if he has bank accounts, home confinement where he would be allowed to only leave for purposes of going to work.  He has employment at Circle K.  He also is employed with Uber Eats, which he can go back to if released.

I do not believe that the government has shown that he is a serious flight risk.  They must show a serious flight risk, not just a flight risk.  He has no failures to appear.  Yes, he has traveled to Mexico.  The spreadsheet shows the various inbound and outbound crossings.  He has a girlfriend in Mexico but his immediate family is here.  His mother and sister are in the courtroom today.  He lives with them.  He's a US citizen.  He's lived here basically his whole life here in Tucson.  Again, he would have to surrender travel documents and passport.

He understands that this is a serious case and if he is released and he goes south that a warrant will issue and he'll be facing possibly five years on top of what he's facing in this current case.

Again, as Mr. Higgins pointed out or the court pointed out, the weight of the evidence is the least important factor here. I think that pretrial services has correctly recommended that he be released, whether -- I don't know if it was on his own recognizance or with his mother as third-party custodian. She is here in the courtroom and has been approved as a suitable third-party custodian.

The other possibility, Your Honor, is he does seem to have or use marijuana here and there. I would propose that he could be screened for a possible inpatient drug treatment. So I would ask the court to consider releasing him.

THE COURT: All right. Thank you. Court finds that the government has established probable cause to believe that the defendants committed the offense charged in the complaint.

Let's take them one at a time. Let's talk about Mr. Sevilla. Mr. Sevilla is charged with in Count 18 -- excuse me, Count 3 and Count 4, with, first, possession -- wait a minute.

MS. TSETHLIKAI: Your Honor, in Count 2.

THE COURT: Count 2, this is not correct on this. Here it is.

He's charged in Count 2 with possession of controlled substance, a large quantity of fentanyl.

Count 3 charges him with possession of a firearm during and in relationship to a drug trafficking offense.

So both of these charges carry minimum mandatory and presumptions.

The presumption is both dangerousness and flight risk. 923(3) is -- 924(c) is also a presumption of dangerousness.

In addition to the presumption of dangerousness, the concern about the presumption of dangerousness is also established by Count 1 charging him with smuggling of firearms. The firearms, according to the government's evidence, were smuggled over a course of time.

In other words, there is a pattern of conduct involving numerous events where the firearms and ammunition and magazines were purchased in the United States and then the inference, clear inference, is that they were transported to Mexico.  It's corroborated -- the government's allegations are corroborated by the records showing inbound and outbound exit and entry records at the ports of entry for both -- for Mr. Sevilla.  And then a couple of firearms -- actually, I think there were, my notes, I think there were three firearms that were purchased by these individuals found in Mexico, which tends to corroborate further that the firearms' destination were in Mexico.

Because the pattern of conduct involving the trafficking of

firearms and the nature of -- you can't draw a blind eye of what's happening in Mexico.  Huge numbers of people being murdered.  These are people who are, through their own conduct, taking the firearms to Mexico and giving them to the people that they're giving to are contributing to this violent activity.  That, in and of itself, while not necessarily, it isn't a crime of violence they're charged with, I can't turn a blind eye to the fact that these firearms were destined for use in a drug war in Mexico and the defendant, Mr. Sevilla, and to the extent involved Mr. Mora also, that's where it was going.

I find that as to Mr. Sevilla, that the government has established by clear and convincing evidence that they're a flight risk, that they are a danger, that the presumption is not overcome for the drug case.  I find that they've established by preponderance of the evidence that he is a flight risk given the penalties that he is facing, his contacts to Mexico, the fact that he has very little significant employment.  He's only worked at the T-Mobile for a very short period of time.  It looks like he earns 12.50 an hour.  He's worked there -- he has worked there for, I don't see here now where it says, but hasn't -- for two months.

So I'm going to order that Mr. Sevilla -- excuse me -- that he be ordered -- I order him detained, finding he's both a danger and the flight risk.  The government has met their burden.

Mr. Mora is not charged with a drug charge.  There's no presumption that applies to Mr. Mora.  The issue with Mr. Mora is is that he, has the government has established by clear and convincing evidence that he is a danger to the community.  And I find that they have established this by virtue of what I've just said about Mr. Sevilla and the drug -- and the firearms trafficking.

I think the government has established a pretty -- a clear case that Mr. Mora was involved in the purchase of firearms and directing others to purchase firearms and recruiting others to purchase firearms, ammunition, and magazines so that they could be exported from the United States to Mexico to supply drug cartels.  And we all know about the killing, the terrible murders that are occurring down there.  And we see that two of the -- three of the guns that were part of this were already apprehended in Mexico, that is, they were seized in Mexico, far south down in Jalisco, which is a long way, as we all know, from the United States.  So these firearms have been able to penetrate deep into Mexico and pose a real danger to the people living down there.

The court finds that this pattern of conduct, this isn't a situation where I've talked -- when I was talking with counsel, about where one event.  This is a -- this is a situation that occurred over a longer period of time, a longer duration, three months, it's a pattern of conduct.  And I, therefore, find that

the government established by clear and convincing evidence that Mr. Mora's a danger and order him detained.

I've tried to be somewhat detailed in this because I know counsel are going to object to my ruling and I want to give you enough opportunity to be able to appeal to the district court if you disagree with this ruling.  Is there anything else you want me in that regard to put on the record?

MR. HIGGINS:  No, Judge.  I think that's a complete record.

THE COURT:  Okay.  If you're satisfied with that, if you need me to say anything else, I'm not trying to build a record better but I'm just asking if there's something that you are troubled with that you think I should put on the record, I'll be happy to make sure you have a record.  No?

MR. HIGGINS:  No, Judge.

THE COURT:  That will be the order of the court. Thank you.

(Whereupon, the matter was concluded at 4:33 p.m.)

UNITED STATES DISTRICT COURT

C E R T I F I C A T E


        I, Cindy J. Shearman, court-approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter to the best of my ability.


   s/Cindy J. Shearman_____          November 27, 2019
Cindy J. Shearman, RDR, CRR, CRC         Date


UNITED STATES DISTRICT COURT